UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

LAURIE A. MALARK,

                    Plaintiff,

        v.                                      **DECISION AND ORDER**
                                                **06-CV-0700**
JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

## Introduction

1.      Plaintiff Laurie A. Malark challenges an Administrative Law Judge's

("ALJ") determination that she is not entitled to disability insurance benefits

("DIB") under the Social Security Act ("the Act").  Plaintiff alleges she has

been disabled since December 11, 2000, because of pain and limitations from

a back condition and from anxiety attacks.  Plaintiff met the disability insured

status requirements of the Act at all times pertinent to this claim.

## Procedural History

2.      Plaintiff filed an application for DIB on February 6, 2004.  Her

application was denied initially and, under the prototype model of handling

claims without requiring a reconsideration step, Plaintiff was permitted to

appeal directly to the ALJ.  See 65 Fed. Reg. 81553 (Dec. 26, 2000).

Pursuant to Plaintiff's request, an administrative hearing was held via video

teleconference on March 1, 2006, before ALJ Thomas P. Zolezzi, at which

time Plaintiff and her attorney appeared.  A vocational expert also appeared

and testified at the hearing.  The ALJ considered the case *de novo*, and on

March 31, 2006, issued a decision finding that Plaintiff was not disabled.  On

May 23, 2006, the Appeals Council denied Plaintiff's request for review.

3.      On June 7, 2006, Plaintiff filed a Civil Complaint challenging

Defendant's final decision and requesting the Court review the decision of the

ALJ pursuant to Section 205(g) and 1631(c) (3) of the Act, modify the

decision of Defendant, and grant DIB benefits to Plaintiff.[1]  The Defendant

filed an answer to Plaintiff's complaint on September 13, 2006, requesting the

Court to dismiss Plaintiff's complaint.  Plaintiff submitted Plaintiff's Brief in

support of Plaintiff's request for review of the ALJ's unfavorable determination

of employment disability on November 30, 2006.  On January 11, 2007,

Defendant filed a Memorandum of Law in Support of the Commissioner's

Motion for Judgment on the Pleadings[2] pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.  After full briefing, the Court deemed oral argument

unnecessary and took the motions under advisement.

## Discussion

**Legal Standard and Scope of Review:**

4.      A court reviewing a denial of disability benefits may not determine

*de novo* whether an individual is disabled.  See 42 U.S.C. § 405(g), 1383

(c)(3); Wagner v. Sec'y of Health and Human Servs., 906 F.2d 856, 860 (2d

Cir. 1990).  Rather, the Commissioner's determination will only be reversed if

---

[1] The ALJ's March 31, 2006, decision became the Commissioner's final decision in this case
when the Appeals Council denied Plaintiff's request for review.
[2] Although no motion for judgment on the pleadings was filed, the moving party was excused from
such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the
proceeding as if both parties had accompanied their briefs with a motion for judgment on the
pleadings…"

it is not supported by substantial evidence or there has been a legal error.

See  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615

F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts

to "more than a mere scintilla," and it has been defined as "such relevant

evidence as a reasonable mind might accept as adequate to support a

conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427,

28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more

than one rational interpretation, the Commissioner's conclusion must be

upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

    5.    "To determine on appeal whether the ALJ's findings are supported

by substantial evidence, a reviewing court considers the whole record,

examining evidence from both sides, because an analysis of the substantiality

of the evidence must also include that which detracts from its weight."

Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If

supported by substantial evidence, the Commissioner's finding must be

sustained "even where substantial evidence may support the plaintiff's and

despite that the court's independent analysis of the evidence may differ from

the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y.

1992).  In other words, this Court must afford the Commissioner's

determination considerable deference, and may not substitute "its own

judgment for that of the [Commissioner], even if it might justifiably have

reached a different result upon a *de novo* review."  Valente v. Sec'y of Health

and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

6.     The Commissioner has established a five-step sequential

evaluation process to determine whether an individual is disabled as defined

under the Social Security Act.  See 20 C.F.R. § 404.1520, 416.920.  The

United States Supreme Court recognized the validity of this analysis in Bowen

v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119

(1987), and it remains the proper approach for analyzing whether a claimant

is disabled.

7.     This five-step process is detailed below:

First, the [Commissioner] considers whether the claimant is currently
engaged substantial gainful activity.  If he is not, the [Commissioner]
next considers whether the claimant has a "severe impairment" which
significantly limits his physical or mental ability to do basic work active-
ties.  If the claimant has such an impairment, the third inquiry is whether,
based solely on medical evidence, the claimant has an impairment
which is listed in Appendix 1 of the regulations.  If the claimant has
such an impairment, the [Commissioner] will consider him disabled with-
out considering vocational factors such as age, education, and work
experience; the [Commissioner] presumes that a claimant who is
afflicted with a "listed" impairment is unable to perform substantial gain-
ful activity.  Assuming the claimant does not have a listed impairment,
the fourth inquiry is whether, despite the claimant's severe impairment,
he has the residual functional capacity to perform his past work.  Finally,
if the claimant is unable to perform his past work, the [Commissioner]
then determines whether there is other work which the claimant could
perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also

Rosa v. Callahan, 168 F.3d 72,77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

8.     While the claimant has the burden of proof as to the first four steps,

the Commissioner has the burden of proof on the fifth and final step.  See

Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).

The final step of this inquiry is, in turn, divided into two parts.  First, the

Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education, and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

9.      In this case, the ALJ made the following findings with regard to factual information as well as the five-step process set forth above: (1) Plaintiff met the insured status requirements of the Social Security Act through December 31, 2005 (R. at 20);[3] (2) Plaintiff has not engaged in substantial gainful activity at any time relevant to this decision (20 C.F.R. 404.1520(b) and 404.1572 et. seq) (R. at 20); (3) Plaintiff has been found to have a severe mental and musculoskeletal impairment (20 C.F.R. § 404.1520(c)) (R. at 20); (4) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526) (R. at 21); (5) After careful consideration of the entire record, the ALJ found Plaintiff has the residual functional capacity to perform a wide range of sedentary work activity. More specifically, Plaintiff is capable of lifting no more than ten pounds at a time and occasionally lifting of carrying articles like docket files, ledgers, and small tools. Plaintiff has the ability to walk and stand for a total of two hours in an eight-hour day and is able to sit for at least six hours in an eight-hour

_____

[3] Citations to the underlying administrative are designated as "R."

workday.  However, Plaintiff requires the ability to change her position as needed using a sit/stand option.  She is able to sit for 20-30 minutes at a time and stand and walk for approximately ten to fifteen minutes at a time.  She should perform little or no bending, kneeling, or squatting and can only occasionally, but not frequently, perform repetitive movements with her hands.  Although Plaintiff has been found to have a severe mental impairment, she is able to meet the basic mental demands of work activity (R. at 21); (6) Plaintiff is unable to perform any past relevant work (R. at 25);  (7) Plaintiff was born on October 4, 1961 and was 39 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 C.F.R  404.1563) (R. at 25);  (8) Plaintiff has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564) (R. at 25);  (9) Transferability of job skills is not material to the determination of disability due to the Plaintiff's age (20 C.F.R. 404.1568) (R. at 26);  (10) Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform (20 C.F.R. 404.1560(c) and 404.1566) (R. at 26);  (11) Plaintiff has not been under a "disability," as defined in the Social Security Act, from December 11, 2000 through the date of the ALJ's decision (20 C.F.R. 404.1520(g)) (R. at 27).  Ultimately, the ALJ determined Plaintiff was not entitled to a period of disability and disability insurance benefits as set forth in sections 216(i) and 223(d) of the Social Security Act (R. at 27).

**Plaintiff's Allegations:**

**The ALJ Improperly Rejected the Treating Physician's Opinions:**

10.     Plaintiff's first challenge to the ALJ's decision is that he rejected the medical evidence provided by the physician who has treated Plaintiff since June 2004, and relied instead on reports and opinions of the disability insurance carrier's doctors and other non-treating sources.  Plaintiff argues the ALJ's decision was not supported by the substantial evidence of record.

According to the "treating physician's rule,"[4] the ALJ must give controlling weight to the treating physician's opinion when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2); see also Green-Younger v. Barnhart, No. 02-6133, 2003 WL 21545097, at *6 (2d Cir. July 10, 2003); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).

Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances.  Under  C.F.R. § 404.1527(d)(1)-(6), the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion,

---

[4] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. SS 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

(4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court.  See de Roman, 2003 WL 21511160, at *9 (citing C.F.R. § 404.1527(d)(2); see also Shaw, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Having reviewed the evidence at issue, this Court detects no reversible error in the ALJ's treatment of the opinion of Plaintiff's treating physician, Dr. James Cole.  Rather, the ALJ's decision reflects his extensive evaluation of all the medical evidence in the record developed from the date of Plaintiff's alleged disability on December 11, 2000, through the date of her hearing before the ALJ on March 1, 2006 (R. 20-25).  The medical evidence includes treatment notes, evaluations of Plaintiff's progress, and test results (R. at 109-304). The opinion of Dr. Cole was inconsistent and unsupported by the record as a whole.

Plaintiff was injured in a fall on September 28, 2000, while working as a nurse at (R. at 109).   She was treated at Albany Memorial Hospital on an emergency basis, and then followed up with her regular physician, Dr. Natarajan Ravi.  Id.  On November 20, 2000, Plaintiff was examined by an orthopedic surgeon, Dr. Donald Cally, at the request of her employer's disability insurance carrier, Liberty Mutual Insurance Company.  Id.  Plaintiff complained of intermittent pain and discomfort localized to the right side of her lower back (R. at 110).  Physical examination revealed that Plaintiff was in no apparent distress.  Id.  Dr. Cally noted she had normal station and gait, and was able to heel-toe and tandem walk.  Id.  While Plaintiff had mild

discomfort to palpation over the paraspinal muscles on her right side, the rest of her physical, motor, and sensory examination was normal. <u>Id</u>. Dr. Cally's impression was that Plaintiff had non-specific axial low back pain. <u>Id</u>. Because Plaintiff was pregnant at the time, the doctor recommended physical therapy and an at-home program of strengthening and stretching, but no medication. <u>Id</u>. He opined Plaintiff had a temporary mild to moderate partial disability, and recommended Plaintiff work in a light or modified duty position only two days per week (R. at 111).

Plaintiff was examined by consulting physician Dr. Sangbok Kim on January 5, 2001 (R. at 112-13). Dr. Kim noted Plaintiff walked slowly with a stiff posture (R. at 112). Upon examination, the doctor observed moderate tenderness at Plaintiff's lower lumbar and upper sacral paraspinal area and decreased back motility. <u>Id</u>. However, Dr. Kim also noted Plaintiff's range of motion of hips, knees, and ankles were within normal limits and without pain, and muscle strength and sensory examinations in Plaintiff's lower extremities were within normal limits. <u>Id</u>. Dr. Kim's impression was that Plaintiff had low back strain because of her work-related injury. <u>Id</u>. Because Plaintiff was pregnant, Dr. Kim recommended Tylenol, gentle exercise, and moist heat applied to Plaintiff's lower back (R. at 113). Dr. Kim opined Plaintiff was "totally disabled for her job" and that "her pregnancy is partly responsible (50%) for her total disability." <u>Id</u>.

On January 15, 2001, Plaintiff was examined by orthopedic physician, Dr. Joseph Fay, at the request of her primary care physician, Dr.

Ravi (R. at 115-116).   Dr. Fay noted Plaintiff had a lot of paralumbar muscle spasm, but her strength and reflexes were good, and her sensory exam was normal (R. at 115).  Dr. Fay opined Plaintiff had severe back strain and contusion.  Id.

Plaintiff was examined again by Dr. Fay on June 7, 2001 (R. at 115).  The doctor noted "she had her babies.  She had twins" and that Plaintiff still had paralumbar muscle spasm and pain.  Id.  Dr. Fay reviewed Plaintiff's x-rays and noted "these show spina bifida occulta at L5 but otherwise things look reasonably good."[5]  Id.

On July 18, 2001, Plaintiff was examined by consulting physician Dr. James Nelson (R. at 126-128).   Dr. Nelson reported Plaintiff complained of back pain that did not subside after the delivery of her twin daughters (R. at 127).   Upon examination, the doctor noted Plaintiff was tender to palpation over the paravertebral musculature on either side of the midline of the lower lumbar region, and complained of pain with flexing forward, bending laterally, and with trunk rotation.  Id.   Plaintiff had a positive straight leg raising test on the right side, but not on the left side (R. at 128).  Dr. Nelson found no neurologic deficits, and no evidence of gross motor weakness.  His impression was chronic muscular and ligamentous lumbar strain.  Id.  The

---

[5] Spina bifida ("cleft spine') is a birth defect affecting the spinal column.  Spina bifida occulta is a defect that is not visible.  It is rarely linked with complications or symptoms, and is usually discovered accidentally when a person has an x-ray or MRI.  Estimates of prevalence from 5% to as high as 40% have been proposed.  See http://www.emedicinehealth.com/spina_bifida/article_em.htm.

doctor opined Plaintiff had a moderate, temporary, and partial disability, and recommended treatment of vigorous physical therapy and weight loss.  Id.

Plaintiff was examined by Dr. Fay again on August 16, 2001, at which time the doctor reviewed Plaintiff's recent x-rays (R. at 116).  The doctor observed the x-rays showed bilateral spondylolysis of the pars interarticularis at L5, but no spondylolisthesis.[6]  Id.  Dr. Fay recommended Plaintiff do exercises to strengthen her abdominal muscles.  Id.

On September 28, 2001, Plaintiff again complained of back pain to Dr. Fay (R. at 116).  Dr. Fay noted, "I am going to send her to pain management because there is nothing else I know of to make her any better." Id.

At the request of Plaintiff's treating physician, Dr. Ravi, she was examined by consulting orthopedic surgeon, Dr. Alan Moskowitz, on October 26, 2001 (R. at 117-118).  Dr. Moskowitz observed Plaintiff's range of motion in her spine was significantly reduced (R. at 117).  He noted, however, that Plaintiff's pain came from extending after being flexed.  Id.  Plaintiff's neurological examination was normal.  Id.  Sitting and supine straight leg raising were 80 degrees bilaterally.  Id.  Palpation of Plaintiff's lumbar region revealed tenderness.  Id.  Dr. Moskowitz obtained supine AP, lateral, and oblique views of Plaintiff's lumbosacral spine, as well as extension x-rays and

---

[6] Spondylolysis is a defect in the connection between vertebrae that can lead to small stress fractures in the vertebra.  The most common symptom of spondylolysis is lower back pain.  Spondylolisthesis occurs when stress fractures weaken the vertebrae so much that one slips out of place.  See http://www.clevelandclinic.org/health/health-info/docs/3900/3912.asp?index=10303.

a Ferguson film (R. at 118).  The AP x-ray showed five non-rib bearing vertebrae with the intercrestal line going through the L4-5 disc space.  Id. The doctor noted Plaintiff's sacroiliac joints were open.  Id.  The lateral x-rays were unremarkable and showed good alignment of the spine.  Id. Flexion and extension x-rays did not show any evidence of hypermobility.  Id. Upon review of an MRI from 1997, Dr. Moskowitz noted degeneration of the disc at L4-5, and asymmetry of the canal at L5-S1, but stated the images were difficult to interpret.  Id.  The doctor's clinical impression was that Plaintiff's condition resulted from degenerative disc disease at L4-5 with associated lumbosacral strain.  Id.  Dr. Moskowitz recommended a new MRI study, and depending on the results, epidural steroid injections at the L4-5, and possibly other, spinal levels.  Id.

Plaintiff was examined again by Dr. Nelson on November 1, 2001 (R. at 121-124).  Dr. Nelson watched Plaintiff walk from the parking lot into the building where his medical practice is located and noted she walked with a normal gait and did not limp (R. at 123).  Dr. Nelson opined Plaintiff did not appear to be a person in severe discomfort.  Id.  Upon examination, Plaintiff complained of tenderness to palpation at the midline level of the lumbosacral joint, and at the right sacroiliac joint.  Id.  Plaintiff complained of pain when flexing forward from the waist, lateral bending, and trunk rotation.  Id.  Seated straight leg raising tests were negative, but Plaintiff complained of pain on both the right and left side when straight leg raising to 45 degrees in the supine position was attempted.  Id.  Neurological and strength tests revealed

normal results.  Id.  Dr. Nelson assessed Plaintiff with chronic muscular and

ligamentous lumbar strain.  Id.  He opined Plaintiff had a mild partial and

temporary disability in her lower back, and also that she had reached her

maximum medical improvement (R. at 124).  Dr. Nelson recommended

Plaintiff engage in physical therapy three times per weeks for six weeks,

rather than engage in treatment at a pain management center.  Id.  He noted

Plaintiff's signs and symptoms were not of such severity to warrant heavy

medication, epidural steroid injections, or facet injections.  Id.  Dr. Nelson

assessed Plaintiff as ready to return to work with the restrictions that she not

lift anything heavier than 25 pounds, or lift things that were less than 24

inches from the floor.  Id.

  On January 28, 2002, Plaintiff underwent an MRI of her lumbar

spine (R. at 129).  The examination revealed very mild facet hypertrophy at

L2-3, and L3-4.  Id.  The radiologist opined Plaintiff had disc desiccation and

disc degeneration at L4-5, with a mild disc bulge and minimal facet

hypertrophy.  Id.    At L5-S1, mild facet hypertrophy was present.  Id.  The

radiologist's impression was that Plaintiff had very mild lumbar spondylosis.

Id.

  Plaintiff was treated by Dr. Arvinder Singh on April 5, 2002, at the

Diagnostic and Interventional Pain Management and Rehabilitation Services

Clinic (R. at 155).  Dr. Singh diagnosed Plaintiff with lumbar internal disc

derangement at L3-4, L4-5, and L5-S1 with bilateral facet hypertrophy, and

right sacroilitis, and recommended fact and joint injections, and a lumbar

epidural steroid injection (R. at 153-154).   Dr. Singh noted Plaintiff was to meet with the clinic's rehabilitation and physical specialist, and recommended a psychological consultation "because there might be a lawsuit against the place where she works" (R. at 154-155).

On April 9, 2002, a colleague of Dr. Singh, Dr. Abdul Arain, assessed Plaintiff as temporarily totally disabled pending pain injection treatments (R. at 150).

On August 21, 2002, and on September 19, 2002, Plaintiff received pain injections from Dr. Singh (R. at 148-149).   He noted Plaintiff reported good pain relief with medications (R. at 149).

Plaintiff was treated with pain injections by Dr. Arain on October 22, 2002 (R. at 146-146).  She reported her back pain was getting worse (R. at 146).

On October 31, 2002, Plaintiff was treated at the emergency room at Albany Memorial Hospital (R. at 162).  She reported she tripped and fell, bruising her hand.  Id.  Past medical history was reported as hypertension, anxiety and depression, with no mention of a back ailment.  Id.   The emergency room physician assessed Plaintiff as "well-appearing" and "in no acute distress."  Id.  The physician diagnosed a hand contusion, and recommended Plaintiff use ice and Motrin to treat the bruise.  Id.

Plaintiff was evaluated for physical therapy on December 17, 2002, and attended a physical therapy session where she received instruction about

exercises on January 14, 2003 (R. at 143-144).   It is unclear from the record if Plaintiff tried the physical therapy exercises in an at-home setting.

On January 15, 2003, and on January 29, 2003, Plaintiff received additional pain injections and epidurals from Dr. Singh (R. at 137-142).

At the request of treating physician Dr. Ravi, Plaintiff was examined by consulting physician Dr. Joel Kremer on February 4, 2003, when she complained of pain in the cervical and thoracic spine (R. at 187-188).  Upon examination, Plaintiff was tender to palpation over the paravertebral muscles from the cervical area, through the thoracic area, to the lumbosacral area (R. at 188).  Dr. Kremer observed Plaintiff had good range of motion, but cervical and lumbar spine movements triggered muscle spasm.  Id.  Plaintiff's neurological and strength assessments in her upper and lower extremities were normal.  Id.  The doctor noted Plaintiff had no radicular pain, and that her pain was a muscle spasm type, relieved with rest and laying flat.  Id.  Dr. Kremer recommended a muscle relaxer, Flexeril, and physical therapy.  Id.

Plaintiff was treated with pain injections again by Dr. Singh on February 27, 2003 (R. at 136).  He reported she was slightly improved, and had good pain relief from the injections.  Id.

Plaintiff was evaluated by Dr. Arain on March 26, 2003 (R. at 133-134).  Upon examination, Plaintiff was tender in the back with leg and ankle pain, and reported painful flexion and extension of the lumbar spine (R. at 133).  Specialized tests were negative for cervical and lumbar root/dural

tension.  Id.  Dr. Arain reported Plaintiff had good relief from the pain
injections.  Id.

On April 16, 2003, April 24, 2003, May 22, 2003, and June 20,
2003, Plaintiff received pain injections from Dr. Singh (R. at 130-132, 174-
175, 177, 179).  On June 20, 2003, Plaintiff reported no pain relief from the
facet injections (R. at 174).

Plaintiff was treated at the emergency room of Albany Memorial
Hospital on July 12, 2003, after she slipped while walking on grass (R. at 160-
161).  Plaintiff's physical examination was normal, except for tenderness to
palpation over the mid-lumbar spine and the left S1 joint (R. at 160).  X-rays
taken during the emergency room visit showed no evidence of fracture,
subluxation, abnormal alignment, or pars defect (R. at 160, 226).  When
compared with x-rays taken on September 16, 2000, the new x-rays showed
stable minimal degenerative changes and grossly normal sacroiliac joints (R.
at 226).

On July 21, 2003, Plaintiff was again treated with pain injections by
Dr. Singh (R. at 172-173).  The doctor reported Plaintiff had good pain control
with the medications (R. at 172).

Plaintiff followed up with Dr. Kremer on August 25, 2003 (R. at 183-
184).  Plaintiff complained of discomfort in her back, wrists, elbows and
shoulders (R. at 183).  Upon examination, Plaintiff had paraspinal tenderness
and tightness.  Id.  She showed good range of motion of both shoulders with
no impingement signs, and good range of motion in both elbows and wrists,

with good grip strength.  Id.  Dr. Kremer recommended Plaintiff continue with Flexeril, Motrin and Vioxx (R. at 183-184).

Plaintiff was evaluated by consulting physician Dr. Bruno Tolge on August 23, 2003 (R. at 202-204).  Upon examination, Plaintiff was tender to palpation in the lower lumbosacral area (R. at 203).  Straight leg raising while sitting was negative bilaterally to 90 degrees.  Id.  In a supine position, straight leg raising was positive at 25 degrees on the left and 35 degrees on the right.  Id.  The doctor noted Plaintiff's range of motion in the lower back was minimal.  Id.  Plaintiff's neurological and motor tests were normal.  Id.  Dr. Tolge recommended Plaintiff try Topamax or Zonegran for pain control and weight management, and obtain a new MRI (R. at 204).

On September 16, 2003, and November 11, 2003, Plaintiff received pain injections from Dr. Singh (R. at 167-168, 170-171).  The doctor noted Plaintiff was slightly improved, stable on her medications, and he prescribed a prolign brace.  Id.

Plaintiff was again examined by Dr. Kremer on February 26, 2004 (R. at 182).  She complained of back pain in spite of all her medications.  Id.  Upon examination, Plaintiff was tender to palpation of the lumbar spine.  Id.  Neurological examination was normal except for weak toe dorsiflexion on the right.  Id.  Dr. Kremer again prescribed Vioxx.  Id.

On February 27, 2004, Plaintiff was diagnosed with bilateral carpal tunnel syndrome by Dr. Suheil Khuri (R. at 192-193).  The doctor instructed Plaintiff to use bilateral wrist braces at night, and take 100mg of Vitamin B6

for several weeks (R. at 192).  Dr. Khuri also requested Plaintiff undergo EMG study of both upper extremities to rule out extremity entrapment neuropathy (R. at 193).

Plaintiff underwent an EMG study of both upper extremities on March 17, 2004 (R. at 189-190).  The results of the study were unremarkable and Plaintiff was instructed to take Advil and continue using the wrist braces and hot packs (R. at 191).

On March 25, 2004, Plaintiff's treating physician, Dr. Ravi, completed a Disability Determination assessment of Plaintiff for the New York State Office of Temporary and Disability Assistance (R. at 212-217).  Dr. Ravi assessed Plaintiff as being capable of lifting frequently, and carrying occasionally, items weighing10 pounds (R. at 214).  He also opined Plaintiff could stand and walk less than two hours per day, sit less than six hours per day, and perform limited pushing and pulling.  Id.  Dr. Ravi assessed no other limitations on Plaintiff's work environment.  Id.

Dr. Tolge again evaluated Plaintiff on April 1, 2004 (R. at 198-201).  Upon examination, straight leg raising in the seated position was negative in the lower left extremity, and equivocal at 85 degrees in the lower right extremity (R. at 199).  In the supine position, straight leg raising was negative in the lower left extremity, and equivocal at 85 degrees in the lower right extremity.  Id.  Range of motion of the cervical spine showed a modest decrease in flexion and extension, but was adequate with left and right rotation (R. at 200).  Plaintiff demonstrated little range of motion in the lower

back.  Id.  Plaintiff's neurological, motor and strength examinations were normal.  Id.  Dr. Tolge assessed Plaintiff as having a marked partial disability and restricted her to lifting no more than 10 pounds (R. at 200-201).

Plaintiff was examined by treating physician Dr. James Cole on June 23, 2004 (R. at 205-206).  Dr. Cole reviewed Plaintiff's 2003 MRI and noted it showed bulging discs (R. at 205).  He also noted she had had a Functional Capacity Examination, but opined it was riddled with errors of fact that made it unusable for planning Plaintiff's future work activities.  Id.  Dr. Cole did not specify the errors.  Upon examination, Plaintiff exhibited tenderness in the muscles of the right posterior superior iliac spine, and paresthesis in the lower left extremity (R. at 206).  However, neurological, motor, and strength tests of Plaintiff's upper extremities were normal, and deep tendon reflexes were 2+ at both knees, and 1+ in both ankles.  Id.  Dr. Cole diagnosed spondylolisthesis of the low back and degenerative disc trauma from Plaintiff's on-the-job injury in September 2000.  Id.  The doctor prescribed intensive physical therapy, Motrin and Lortab, and a TENS unit, and restricted Plaintiff from lifting more than 10 pounds.[7]  Id.

On July 6, 2004, Plaintiff underwent x-rays of her cervical and thoracic spine (R. at 223).  The x-rays of Plaintiff's cervical spine showed the vertebrae to be intact with normal disc spaces.  Id.  The x-rays of Plaintiff's thoracic spine showed minor degenerative spurring, but no compression fractures.  Id.  The alignment of Plaintiff's thoracic spine was normal.  Id.

---

[7] Transcutaneous electrical nerve stimulation (TENS) is a commonly used form of electroanalgesia.  See http://www.emedicine.com/pmr/topic206.htm.

Plaintiff was examined by Dr. Cole again on August 19, 2005 (R. at 291). He noted a palpable spasm in the right lumbar paraspinals, and left cervical and thoracic paraspinals. Id. Plaintiff's neurological examination was normal. Id. Dr. Cole administered an injection of Toradol. Id. The doctor recommended an MRI of Plaintiff's cervical spine. Id.

On September 27, 2004, Plaintiff underwent a consultative psychiatric evaluation by Kerry Brand, Ph.D. (R. at 228-231). The psychologist assessed Plaintiff as having significant anxiety and depression, but also opined Plaintiff's psychiatric difficulties would not interfere with her ability to function on a daily basis (R. at 231).

On the same day, Plaintiff underwent a consultative orthopedic examination by Dr. Amelita Balagtas (R. at 233-235). Dr. Balagtas noted Plaintiff walked with a slight limp on the right side, but she was able to take a few steps on heels and toes, with slight difficulty on the right (R. at 234). Plaintiff's station was normal and she used no assistive devices. Id. Dr. Balagtas observed Plaintiff's hand and finger dexterity were intact and her grip strength was 5/5 bilaterally. Id. Upon examination of Plaintiff's cervical spine, Dr. Balagtas found full range of motion in flexion, extension, lateral flexion, and rotary movements. Id. The doctor observed no cervical or paracervical pain or spasm, and no trigger points. Id. Examination of Plaintiff's upper extremities revealed normal results. Id. Upon examination of Plaintiff's thoracic and lumbar spine, Dr. Balagtas found Plaintiff's forward flexion of the lumbar spine limited to 30 degrees by Plaintiff's reports of pain,

as well as limitation of lateral flexion to 10 degrees bilaterally, and limitation of rotary movement to 0 to 10 degrees (R. at 235).   The doctor noted tenderness upon palpation of the right lumbar paraspinals, and paraspinal spasm.  Id.  Dr. Balagtas observed no S1 joint or sciatic notch tenderness.  Id. Straight leg raising was limited to 40 degrees on the right, and 60 degrees on the left, by Plaintiff's low back pain.  Id.  Examination of Plaintiff's lower extremities revealed normal results, including full range of motion at hips, knees, and ankles.  Id.  Sensory, strength, and motor tests of Plaintiff's lower extremities were normal.  Id.  Dr. Balagtas's impression was low back pain, but she requested an x-ray to rule out discogenic disease.  Id.  She also opined Plaintiff would have some limitations in activities that require bending, lifting, prolonged sitting, and prolonged standing or walking.  Id.

An x-ray of Plaintiff's lumbar sacral spine taken on September 27, 2004, revealed no bony or disc space pathology (R. at 236).  The radiologist, Dr. Pesho Kotval, noted Plaintiff's vertebral body heights and disc spaces were maintained and no spondylolysis or spondylolisthesis was observed.  Id. No osteophytosis was present and the lordotic curvature was preserved.  Id.

Plaintiff followed up with Dr. Cole on December 1, 2004 (R. at 290). He again diagnosed lumbar spondylolisthesis, and based on an early MRI of Plaintiff's thoracic spine, diagnosed a paracentral disc protrusion at T5-6.  Id. Dr. Cole recommended an EMG nerve conduction test on Plaintiff's left cervical, right thoracic and right lumbar spine.  Id.

21

Plaintiff underwent an EMG nerve conduction study on January 3, 2005 (R. at 285-287).  Based on the results of the study, Dr. Cole diagnosed right lumbar nerve root irritation (R. at 287).  The doctor opined Plaintiff was disabled pending a clean, unbiased Functional Capacity Examination (R. at 284).

On March 3, 2005, Dr. Cole completed a Physical Capacities Evaluation form at the request of Plaintiff's attorney, and opined Plaintiff could lift and carry seven pounds, could not work for eight hours in a work day, and would have to lie down every afternoon to relieve pain (R. at 296).

Plaintiff followed up with Dr. Cole on July 6, 2005 (R. at 299).  The doctor again diagnosed Plaintiff with right lumbar spondylolisthesis, but did not update his record with information about Plaintiff's cervical or thoracic condition.  Id.  He noted that Plaintiff had moderate spasm on palpation of the low back.  Id.  The doctor advised Plaintiff about pool exercise techniques, and the importance of good sleep hygiene.  Id.  He prescribed medication for fluid retention and Motrin for joint and muscle pain.  Id.

Plaintiff was examined by Dr. Cole again on September 8, 2005 (R. at 303).  He noted Plaintiff's right paraspinals were tender to palpation, but there was little spasm.  Id.  Flexion was limited to 30 degrees.  Id.  Deep tendon reflexes were symmetrical 1+ at the knees and ankles.  Id.  Dr. Cole diagnosed right lumbar spondylolisthesis, with some radicular findings on Plaintiff's right side.  Id.  He prescribed new pads for Plaintiff's TENS unit, Toradol, and Lortab.  Id.

On November 8, 2005, Plaintiff was examined by Dr. Cole (R. at 302).  The doctor reported Plaintiff thought she was being followed by a private investigator.  Id.  Dr. Cole noted his interpretation of Plaintiff's EMG study in January 2005 suggested sharp activity in Plaintiff's right paraspinal muscles, but with no radiculopathy.  Id.  He also noted an earlier MRI study showed disc protrusion at T5-6, but with no herniations in the lumbar area.  Id.  Dr. Cole prescribed Motrin, Oxycontin, and an increased dose of Lortab.  This is the final entry of a physician's notes in Plaintiff's record.

The ALJ assessed Plaintiff capable of sedentary work with a sit/stand option based on the totality of evidence presented by her treating physicians, independent medical examiners, test results, and the opinions of a State agency examining physician, a State agency examining psychologist, and a State agency psychiatrist.  Plaintiff's neurological tests and motor, sensory, and strength examinations were consistently normal, or showed minimal findings (R. at 109-304).  As an example, Plaintiff was treated shortly after her injury by an orthopedic surgeon, Dr. Cally (R. at 109-111).  Dr. Cally noted Plaintiff was performing her usual and customary duties at work, but on a modified schedule of two days per week (R. at 109).   Upon examination, the doctor noted Plaintiff's mild discomfort to palpation over the paraspinal musculature on the right side, but also that the results of her motor and sensory examinations were normal (R. at 110).  Dr. Cally recommended Plaintiff continue with physical therapy, which she reported was helping her back condition, as well as with the modified work schedule (R. at 110-111).

The ALJ gave some weight to the opinion of Dr. Cally that Plaintiff was able to work in a modified or light duty position, but little weight to the opinion that she should work only two days per week (R. at 23).

The ALJ also considered the opinion of Dr. Sangbok Kim, a board certified specialist in rehabilitation and electrodiagnostic medicine (R. at 112-113). Dr. Kim opined Plaintiff was totally disabled for her job as nurse because the high level of physical activity necessary to perform the requirements of the job, but attributed 50% of Plaintiff's disability to her complicated pregnancy (R. at 113). The ALJ gave great weight to the opinion of Dr. Kim because it established Plaintiff was no longer capable of performing her past relevant work as a nurse (R. at 23).

The ALJ reviewed the opinion of Dr. James Nelson, who examined the Plaintiff on two occasions, and noted she was carrying out her activities of daily living, including driving a car, and caring for her infant twins (R. at 128). Other than tenderness to palpation in the lower back, Dr. Nelson noted mostly normal results when he examined Plaintiff (R. at 123, 127-128). Dr. Nelson opined Plaintiff would benefit from continued physical therapy, and that her signs and symptoms were not of such severity to warrant heavy medications, epidural steroid injections, or facet injections that would be standard treatment in a pain management setting (R. at 124). Dr. Nelson further opined Plaintiff could return to work as long as she did not have to lift anything heavier than 25 pounds, or lift items that were less than 24 inches from the floor. Id. The ALJ afforded significant weight to the opinion of Dr.

Nelson as it was consistent with the opinions of Doctors Cally and Kim (R. at 23-23).

The ALJ considered the opinion of independent examiner Dr. Bruno Tolge, who examined Plaintiff on two occasions (R. at 198-201, 202-204). After examining Plaintiff on April 1, 2004, Dr. Tolge noted that while he found Plaintiff to have pain, she had an objectively normal neurological examination (R. at 201).  The doctor opined, "Based on the New York State Workers' Compensation Board Guidelines, the examinee appears to have a marked partial disability with no lifting over ten pounds" (R. at 200).  The ALJ gave the opinion of Dr. Tolge some weight in establishing the Plaintiff's residual functional capacity (R. at 23).

The ALJ also considered the assessment of Plaintiff's long term treating physician, Dr. Natarajan Ravi (R. at 212-217, 263-279).  Dr. Ravi reviewed Plaintiff's treatment history, clinical findings, and laboratory findings, and assessed her as capable of performing the requirements of sedentary work with a sit/stand option (R. at 212-214).  The ALJ gave Dr. Ravi's opinion full consideration as it was consistent with the opinions of the other physicians as noted above.

The ALJ reviewed the opinion of State agency consulting examiner, Dr. Balagtas, and while he noted that the opinion was somewhat vague and non-specific, it was consistent with the notion that Plaintiff could perform the requirements of sedentary work with a sit/stand option, we well as some postural limitations (R. at 232-235).  Thus the opinion was consistent with the

opinions of Doctors Cally, Kim, Nelson, Tolgi, and Ravi, and the ALJ gave it significant weight on the basis that it was consistent with the totality of the record (R. at 23-24).

Plaintiff asserts the ALJ improperly disregarded the opinion of Plaintiff's treating physician, Dr. James Cole, that her exertional and non-exertional limitations would preclude her from performing even the requirements of sedentary work with a sit/stand option.  See Plaintiff's Brief, p. 13.  Plaintiff claims the ALJ dismissed Dr. Cole's opinion in summary fashion, concluding that Dr. Cole's opinion is "simply not supported or consistent with the record," and giving as support for this conclusion only a recitation of Plaintiff's activities of daily living.  See Plaintiiff's Brief, pp. 13-14.

The Court disagrees with Plaintiff's assertion that the ALJ dismissed Dr. Cole's opinion in summary fashion.  In his decision, the ALJ reviewed carefully and at length the medical assessments, opinions, and conclusions of Dr. Cole.  As an example, the ALJ noted that in June 2004, Dr. Cole opined Plaintiff was at a total temporary disability, yet stated Plaintiff was not allowed to lift no more than 10 pounds at one time, or push more than 20 pounds at one time (R. at 24, 293).  Dr. Cole also stated Plaintiff was independent in her daily activities and took care of her three year-old twins (R. at 292).  In June 2004, Dr. Cole diagnosed Plaintiff with lumbar spondylolisthesis, yet her MRI ordered by Dr. Ravi in January 2002 revealed only "very mild lumbar spondylosis at L4-5" (R. 129, 290).  Dr. Cole offered no objective evidence that would confirm this new finding.  In January 2005, Dr.

Cole again opined Plaintiff was at a total temporary disability pending a "clean unbiased Functional Capacity Evaluation" (R. at 24, 284).  Yet the doctor provided no clue as to why he opined Plaintiff's Functional Capacity Evaluation was biased and invalid (R. at 284).  In January 2005, Dr. Cole opined Plaintiff may have rehabilitation potential for a sedentary, non-lifting career, but in March 2005, he completed a Physical Capacities Evaluation form limiting Plaintiff to sitting 1 and ½ hours per day, standing ½ hour per day, no walking, and no lifting of items over seven pounds (R. at 287, 296). In July 2005, Dr. Cole noted Plaintiff walked short distances in her neighborhood, an inconsistency with his earlier Physical Capacities Evaluation that limited Plaintiff to no walking (R. at 296, 299).  Also in July 2005, Dr. Cole again diagnosed Plaintiff with lumbar spondylolisthesis, yet an x-ray of Plaintiff's lumbar sacral spine taken in September 2004 showed no spondylolisthesis or spondylolis (R. at 236, 299).  A review of Plaintiff's complete record, along with ALJ's decision, reveals the ALJ carefully considered the medical evidence and opinions provided by Dr. Cole, but that Dr. Cole's evidence and opinions were inconsistent with numerous other physicians who examined and treated Plaintiff during the time frame relevant to her claim.  Thus the ALJ gave some weight to the opinions of Dr. Cole that were consistent with Plaintiff's other treating and examining physicians, and discounted the opinions that were vague, inconsistent, conclusive, or about matters that are reserved to the Commissioner (R. at 24-25).

Based on the foregoing, this Court finds that it was not improper for the ALJ to have limited his consideration of the medical assessment of Dr. Cole, and ultimately predicate his disability determination on the objective medical results, and the medical opinions consistent with those results, contained in the record.  It is the sole responsibility of the ALJ to weigh all medical evidence and resolve any material conflicts in the record.  See Richardson v. Perales, 402 U.S. 389, 399, 91 S. Ct. 1420, 1426, 28 L. Ed. 2d 842 (1971).  Under the circumstances presented in this case, it cannot be said that the ALJ disregarded the medical evidence from Plaintiff's treating physician, and instead relied solely on the opinions of physicians who examined and treated Plaintiff only at the behest of her disability insurance carrier.  Rather, this Court finds that the ALJ afforded less weight to the assessment of Dr. Cole, which seems to have been based largely on Plaintiff's subjective complaints, than he afforded the medical opinions that were consistent with the objective clinical findings in the record.

**The ALJ Failed to Consider Plaintiff's Pain and Subjective Symptom Testimony:**

11.    Plaintiff's second allegation is that the ALJ failed to consider Plaintiff's pain and subjective symptom testimony in determining Plaintiff was not disabled under the Act.  As an example, Plaintiff claimed that because of pain, she could stand only five to ten minutes before she had to sit, could sit for only ten to 15 minutes, and could walk for only five minutes (R. at 322). The ALJ considered Plaintiff's testimony regarding her pain and symptoms, weighed the testimony against the objective medical evidence, and found

Plaintiff's complaints of uncontrollable and disabling pain to be not totally credible (R. at 25).

Courts in the Second Circuit have determined pain is an important element in DIB and SSI claims, and pain evidence must be thoroughly considered.  See Ber v. Celebrezze, 333 F.2d 923 (2d Cir. 1994).  Further, if an ALJ rejects a claimant's testimony of pain and limitations, he or she must be explicit in the reasons for rejecting the testimony.  See Brandon v. Bowen, 666 F. Supp. 604, 609 (S.D.N.Y. 1997).

However, subjective symptomatology by itself cannot be the basis for a finding of disability.  A claimant must present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptomatology alleged.  See 42 U.S.C. §§ 423(d)(5)(A), 1382c (a)(3)(A); 20 C.F.R. §§ 404.1529 (b), 416.929; SSR 96-7p; Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995).  In this case, there is no question Plaintiff's lower back pain is a severe impairment, but her reported subjective symptoms suggest a greater restriction of function than would be indicated by the medical evidence in the record.  Likewise, the ALJ found Plaintiff's anxiety to be a severe mental impairment, but her objective signs and symptoms of this ailment were not so marked as to render her totally disabled for the purposes of the Act.  Thus, the ALJ considered Plaintiff's daily activities, the type and nature of the symptoms reported, the medication and other treatment Plaintiff used to alleviate her symptoms, and any other measures she used to relieve pain (R. at 12-17).  See 20 C.F.R. §§

404.1529(c)(3), 416.929(c)(3); SSR 96-7p.  The ALJ's decision shows he reviewed Plaintiff's complaints of pain and other symptoms, but found the medical and other evidence did not corroborate Plaintiff's claim of disabling pain (R. at 25).

As an example, the ALJ assessed Plaintiff had some limitations because of her chronic pain and other symptoms, including anxiety and depression, but noted "the record does not support a finding that her pain is so intensive that it would render the [Plaintiff] disabled (R. at 25).  The ALJ pointed to Plaintiff's own report to Dr. Kerry Brand that she was able to prepare food and cook, but she rested between activities (R. at 25, 230).  She told Dr. Brand that she filled her days with light housekeeping and childcare (R. at 25, 231).  This information was corroborated in office notes prepared by Dr. Cole, who recorded, "[Plaintiff] is independent in activities of daily living. She cares for three year-old twins" (R. at 292).  In her Adult Function Report prepared on March 29, 2004, Plaintiff reported she was able to bathe herself but needed assistance with shaving her legs, prepared light meals, drove to the post office and did light shopping at the corner store by herself approximately once a week, was able to sit for 30 to 40 minutes at a time to engage in hobbies including watching television, reading, and talking on the telephone, and visited her mother weekly (R. at 85-89).  Such wide and varied activities do not corroborate Plaintiff's claim of totally disabling pain and other limitations.

Further, Plaintiff told examining physician Dr. Kim that she left her employment as a nurse in December 2000 because she was unable to perform her regular duties as a nurse two days per week, and no light duty work was available (R. 25, 112).

The ALJ observed in his examination of Plaintiff's record that most of her treatments have been conservative in nature (R. at 25). It is clear from the record Plaintiff reported to Dr. Nelson that physical therapy had been effective in relieving her symptoms, yet against the advice of this doctor who recommended intensive physical therapy as treatment for Plaintiff's back ailment, she elected heavy medication, facet injections, and epidural steroid injections (R. at 167-179, 290-291). While the record suggests these treatments may have temporarily alleviated Plaintiff's pain, over the long term her treatments have been mostly conservative, including physical therapy, home-based stretching and exercises, over-the-counter medications, and commonly prescribed prescription drugs (R. at 25, 109-304). With respect to Plaintiff's anxiety, she has taken psychotropic medications prescribed by her treating physicians, but has not been treated in a psychotherapeutic setting, including individual or group counseling, at any time relevant to her claim (R. at 20, 144, 160, 162, 188, 194, 203, 218, 219, 221, 228, 243-259, 266, 270, 272, 275, 320).

Finally, the ALJ noted Plaintiff's record contained varying and inconsistent reports of her ability to walk (R. at 25). Only Dr. Cole's Functional Capacity Evaluation suggested Plaintiff could not perform work

where she had to walk at any time during a regular work-day (R. at 296). Yet

Dr. Cole's visit notes record that Plaintiff "walks short distances in her

neighborhood," and "walks the length of her driveway and back for exercise"

(R. at 299, 302). This inconsistency casts doubt on Plaintiff's claim that she

could not perform the minimal walking required for a sedentary job with a

sit/stand option.

      In sum, the Court finds the ALJ properly considered Plaintiff's pain

and symptomatology, along with the medical and other evidence in the

record, and the totality of evidence does not substantiate Plaintiff's claim that

her pain and other symptoms were disabling. Accordingly, the ALJ exercised

his discretion to evaluate the credibility of Plaintiff's testimony, presented an

explicit summary of his evaluation, and render an independent judgment

regarding the extent of Plaintiff's subjective complaints based on the objective

medical and other evidence (R. at 25). See e.g. Mimms v. Sec'y of Health

and Human Servs., 750 F.2d 180, 196 (2d Cir. 1984).

      **The ALJ Improperly Concluded that Plaintiff Retained the**
      **Residual Functional Capacity to Perform Work at the**
      **Sedentary Level with the Sit/Stand Option:**

12.    Plaintiff's third challenge is that the ALJ improperly concluded she

retained the residual functional capacity to perform alternative work at the

sedentary level with a sit/stand option. See Plaintiff's Brief, pp. 18-20.

Plaintiff's challenge has two prongs. First, she cites the Physical Capacities

Evaluation completed by her treating physician, Dr. Cole, in which he opines

she cannot work a full eight-hour day, and must lay down for an hour each

afternoon (R. at 296).  <u>See</u> Plaintiff's Brief, pp .19-20.  Second, she claims the ALJ failed in his burden to demonstrate that there was alternative work in the national and local economies that Plaintiff could do.  <u>See</u> Plaintiff's Brief, p. 20.  Each prong of Plaintiff's challenge will be addressed below.

### The ALJ Improperly Ignored the Physical Capacities Evaluation of Her Treating Physician:

An ALJ is not required to adopt a conclusion by a medical provider that a claimant is disabled, as disability determinations are reserved for the Commissioner.  <u>See</u> 20 C.F.R. § 404.1527(e).  In this matter, the ALJ reviewed all relevant evidence about Plaintiff's medical condition and concluded Plaintiff was not disabled within the meaning of the Act.  While several of Plaintiff's treating and examining physicians "disabled" her from work as a nurse pursuant to her workers' compensation claim, only Dr. Cole opined she is totally disabled for the purpose of performing any type of significant gainful activity (R. at 111, 113, 116, 124, 128, 199, 201, 235, 259, 296.)  A treating source's opinion of disability rendered for the purpose of a workers' compensation claim is not binding on the Commissioner.  <u>See</u> <u>Gray v. Chater</u>, 903 F. Supp. 293, 299 n. 7 (N.D.N.Y. 1995).  A claimant is entitled to benefits under the Act only if his or her impairments are so severe that the individual cannot perform either past relevant work, or any other substantial gainful activity existing in substantial numbers in the national economy.  <u>See</u> 42 U.S.C. § 423(d) (2) (A); <u>see</u> <u>also</u> <u>Gray v. Chater</u>, 903 F. Supp. 293, 301, n. 8 (1995).  In this matter, the Court finds the ALJ properly assessed Plaintiff's substantial medical evidence, as well as the opinions of her treating

physicians concerning her level of disability, and concluded Plaintiff was not disabled under the Act.

### The ALJ Failed to Properly Evaluate Available Alternative Work in Significant Numbers in the National and Local Economies for Her Sedentary Residual Functional Capacity:

Plaintiff's second claim is that the ALJ failed to demonstrate there was alternative work existing in significant numbers in the national and local economies that Plaintiff could perform given her sedentary residual functional capacity, with the requirement to sit or stand as needed, and to perform only limited fingering because of her history of carpal tunnel syndrome.  See Plaintiff's Brief, 18-20.  During Plaintiff's hearing before the ALJ, a vocational expert appeared and testified about entry-level jobs that would be available to Plaintiff given her limitations (R. at 331-336).  The two jobs identified were Preparer (DOT Code 700.687-062) and Surveillance System Monitor (DOT Code 379.367-010).  Plaintiff first asserts she cannot perform the work of a Preparer because the job requires both extensive grasping of larger objects, and repetitive gripping and fingering of small objects.  Because Plaintiff has been diagnosed with bilateral carpal tunnel syndrome, and the ALJ has acknowledged this condition is a limitation to Plaintiff's employment, it is clear she cannot engage in employment that requires repetitive fingering of objects (R. at 22, 192-193).  See Plaintiff's Brief, p. 19.  The Commissioner concedes Plaintiff is correct on this point.  The Dictionary of Occupational Titles ("DOT") notes that the position of Preparer requires repetitive handling and fingering

of objects.   See Memorandum of Law in Support of the Commissioner's
Motion for Judgment on the Pleadings, p. 19.

Second, Plaintiff asserts she cannot perform the requirements of
Surveillance System Monitor job because she must lie down for at least an
hour during the workday.   See Plaintiff's Brief, p. 19.   Plaintiff points out that
upon questioning by her attorney, the vocational expert acknowledged that
given this special requirement, no jobs would be available to Plaintiff in the
national or local economies.   Id.   However, as noted above, the ALJ was not
required to simply accept opinions of Plaintiff's physician of her disability or
limitations her impairments might impose.   Decisions about such matters are
reserved to the Commissioner.   See 20 C.F.R. § 404.1527(e).   In this case,
the record contains substantial evidence to support the ALJ's determination
that Plaintiff was not under a disability, as defined by the Act, at any time
during the time frame relevant to her claim.   Thus, it was not necessary for
the ALJ to accept the hypothetical question posed to the vocational expert by
Plaintiff's attorney, or the vocational expert's reply to a notion the ALJ had
already rejected, i.e., that no jobs would be available to Plaintiff if she had a
special requirement to lie down for an hour during each workday.   See Dumas
v. Schweiker, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983).   ("Because there was
substantial evidence to support the Secretary's conclusion that Dumas
retained the residual functional capacity for sedentary work, the ALJ rightfully
removed that issue from the vocational expert's consideration. The vocational
expert is just that, a vocational expert. The ALJ is responsible for determining,

based on all the evidence, the claimant's physical capabilities. Dumas mistakenly argues that the vocational expert's negative response to the following hypothetical establishes his inability to perform gainful employment: "If you assume an individual like the claimant, his age, education, and experience, who is subjected to headaches of the character as he has testified to, unpredictably, at intervals of not more than 10 days or so, would he then be capable of doing the jobs which you've described?"  Having discounted Dumas' assessment of the severity of his headaches, the ALJ was entitled to rely on the vocational expert's prior opinion that Dumas possessed the skills necessary to perform the job of timekeeper."  Id.  Thus, according to Dumas v. Schweiker, having determined Plaintiff was not disabled based on the substantial evidence of record, the ALJ properly relied on the testimony of the vocational expert to determine there were a significant number of entry-level sedentary jobs compatible with Plaintiff's limitations in the national and local economies that would be available to her.  See Dumas v. Schweiker, 712 F.2d 1545, 1553-1554 (2d Cir. 1983)).

## Conclusion

13.     After carefully examining the administrative record, the Court finds substantial evidence supports the ALJ's decision in this case, including the objective medical evidence and supported medical opinions.  It is clear to the Court that the ALJ thoroughly examined the record, afforded appropriate weight to all the medical evidence, including Plaintiff's treating physicians, consultative examiner, and State agency medical consultant, and afforded

Plaintiff's subjective claims of pain an appropriate weight when rendering his decision that Plaintiff is not disabled.  The Court finds no reversible error, and further finding that substantial evidence supports the ALJ's decision, the Court will grant Defendant's Motion for Judgment on the Pleadings and deny Plaintiff's motion seeking the same.

IT IS HEREBY ORDERED, that Defendant's Motion for Judgment on the Pleadings is GRANTED.

FURTHER, that Plaintiff's Motion for Judgment on the Pleadings is denied.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.

Victor E. Bianchini
United States Magistrate Judge

Dated:  April 22, 2008
          Syracuse, New York